**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

CIVIL ACTION NO. 2:21-CV-080 (WOB-CJS)

CARY WILLIAMS,                                                    PLAINTIFF,

VS.                          <u>MEMORANDUM OPINION AND ORDER</u>

KENTON COUNTY, KY, ET AL.,                                       DEFENDANTS.

This is a lawsuit brought by Cary Williams against Kenton County and four deputies at the Kenton County Detention Center stemming from an incident that occurred there in August 2020. Currently before the Court are Defendants' Motion for Summary Judgment, (Doc. 74), Plaintiff's Motion to Exclude or Limit the Testimony of Defendants' Expert, (Doc. 79), and Plaintiff's Motion to Strike the New Arguments in Defendants' Reply or, in the alternative, for Leave to File a Sur-Reply *Instanter*, (Doc. 92).

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.[1]

### *Factual and Procedural Background*

On August 16, 2020, Plaintiff Cary Williams ("Williams") attended a friend's birthday party in Covington, Kentucky and also visited a nearby bar. (Doc. 74 at 2; Doc. 88 at 8). After a bartender called 911 regarding an alleged altercation between

---

[1] The Court will deny Plaintiff's Motion to Strike but will grant Plaintiff's Motion for Leave to File a Sur-Reply *Instanter*. The Court has considered all briefing submitted by both parties.

Williams and another patron, Covington Police officers responded to the scene at 10:05 p.m.[2] (Doc. 74 at 2; Doc. 74-3 at 3-4). At 10:10 p.m., the officers arrested Williams for public intoxication and the arrest was captured by their body-worn cameras.[3] (Doc. 74 at 2 n.2; Doc. 76, Cov. BWC; Doc. 88 at 8). At 10:10:50 p.m., Williams fell onto the sidewalk while handcuffed. (Doc. 74 at 19; Doc. 76, Cov. BWC; Doc. 88 at 43 n.14).

Williams was transported to the Kenton County Detention Center ("KCDC") and arrived there around 10:40 p.m. (Doc. 74-10 at 1; Doc. 88 at 8). He was assessed at intake and thereafter assigned to an isolation cell under existing COVID-19 protocols because he is immunocompromised and because he was placed on suicide watch based on his answers to the relevant questions during the booking

---

[2] Although the video footage from the body-worn cameras submitted as evidence in this case uses Coordinated Universal Time (UTC), all time references herein are to Eastern Daylight Time. (See Doc. 74 at 2 n.2).
[3] Several video files were filed conventionally with the Court. (Doc. 76; Doc. 89). The "Cov. BWC" footage was captured by the arresting officers' body-worn cameras, the "Williams C 16_T1" and "Williams C 19_T1" footage were captured by surveillance cameras at the Kenton County Detention Center, and the "Williams_Cary_disruptive (Slaughter)" footage was captured by Deputy Leonard Slaughter's body-worn camera. The parties do not dispute that the Court may properly consider the video footage, and both the Plaintiff and the Defendants have discussed it at length in their briefing. (See Doc. 74 at 4; Doc. 88 at 9-13). Further, the Supreme Court found that a video may be considered at the summary judgment stage, particularly where it contradicts a version of the facts as told by one of the parties. Scott v. Harris, 550 U.S. 372, 380-81 (2007); see also Dunn v. Matatall, 549 F.3d 348, 353 (6th Cir. 2008) (finding that Scott "instructs us to determine as a matter of law whether the events depicted on the video, taken in the light most favorable to [the plaintiff], show that the Officers' conduct was objectively reasonable.").

process.[4] (Doc. 74 at 3; Doc. 88 at 8). Deputy Noah Schoultheis ("Deputy Schoultheis") and Deputy Leonard Slaughter ("Deputy Slaughter") escorted Williams from booking to the medical isolation unit where Deputy Cory Fleckinger ("Deputy Fleckinger") and Deputy Nick Taylor ("Deputy Taylor") were on post. (Doc. 74 at 3; Doc. 88 at 9). Defendants agree that Williams did not display any physical aggression toward any deputy or clerk during the booking process or while being escorted to the isolation unit. (Doc. 74 at 3).

Once Williams was inside his cell, Deputy Slaughter held open a property bag and instructed Williams to remove his street clothes and change into a suicide smock due to his "high watch" status. (*Id.*; Doc. 88 at 9). Deputy Slaughter's body-worn camera and KCDC's surveillance cameras captured the incident that followed. (Doc. 74 at 4; Doc. 76, Williams C 16_T1, Williams,_Cary_disruptive (Slaughter)). As Williams began undressing, Deputy Schoultheis approached the door and stood to Deputy Slaughter's left in the open doorway. (Doc. 76, Williams C 16_T1; Doc. 74 at 3; Doc. 88 at 9). Deputy Fleckinger stood behind Deputies Schoultheis and Slaughter. (Doc. 76, Williams C 16_T1; Doc. 74 at 3–4; Doc. 88 at 9). At 11:43:01 p.m., as Williams was removing his shorts, Deputy Slaughter told him, "You're not going to throw these at me when

---

[4] Williams disputes that he was suicidal at KCDC but agrees that he was nonetheless placed on suicide watch. (Doc. 88 at 9 n.1).

you take them off." (Doc. 76, Williams,_Cary_disruptive (Slaughter); Doc. 88 at 9). Williams handed over his shirt and shorts without incident. (Doc. 76, Williams,_Cary_disruptive (Slaughter); Doc. 88 at 9).

At 11:43:27 p.m., the deputies instructed Williams to take his underwear off. (Doc. 76, Williams,_Cary_disruptive (Slaughter); Doc. 88 at 9). Williams responded, "Take my underwear off? Really?" (Doc. 76, Williams,_Cary_disruptive (Slaughter); Doc. 88 at 9). He then called the deputies "fascists" and "Nazis" while removing his underwear. (Doc. 76, Williams,_Cary_disruptive (Slaughter)).

At 11:43:42 p.m., Williams tossed his underwear toward Deputy Schoultheis. (*Id.*). Deputy Schoultheis used his right hand to deflect the underwear and they landed on his right shoulder. (*Id.*). One second later, Deputy Slaughter reached forward and removed the underwear from Deputy Schoultheis's shoulder. (*Id.*). At 11:43:44 p.m., Deputy Schoultheis moved forward, making contact with Williams's neck using a straight arm and an open hand, and began pushing him under the chin toward the rear of the cell. (*Id.*) Deputy Slaughter entered the cell behind Deputy Schoultheis while Deputy Fleckinger remained in the cell doorway. (Doc. 76, Williams C 16_T1). At 11:43:45 p.m., Williams fell backward onto the floor of the cell. (Doc. 76, Williams,_Cary_disruptive (Slaughter)). His right arm was blocked from the camera by Deputy Schoultheis's body,

4

but his left arm was above him, reaching toward the wall. (*Id.*). At the same moment, Deputy Slaughter said "Alright." (*Id.*; Doc. 88 at 11).

While Williams remained on the floor of the cell, Deputy Schoultheis yelled, "Do it again," to which Williams replied, "Do what?" and "Yeah. Whatever." (Doc. 76, Williams,_Cary_disruptive (Slaughter); Doc. 88 at 11). Thereafter Deputy Schoultheis left the cell and Deputy Slaughter tossed in the suicide smock. (Doc. 76, Williams,_Cary_disruptive (Slaughter)). At 11:44:08 p.m., Deputy Slaughter closed the cell door. (*Id.*).

At around 3:40 a.m., Licensed Practical Nurse Angela Miller ("Nurse Miller") arrived at Williams's cell, accompanied by Deputy Taylor, to do a "diabetic check." (Doc. 74 at 5; Doc. 88 at 12). Though this visit was captured on surveillance video, there is no audio recording of the encounter. (*See* Doc. 76, Williams C 19_T1). At 3:42:18, a.m., Williams can be seen gesturing to his right arm. (*Id.*). However, he thereafter uses his right arm to sign a document. (*Id.*).

The parties agree that, at some point during Nurse Miller's visit, Williams complained of arm pain. (Doc. 74 at 5; Doc. 88 at 12-13). However, Nurse Miller documented that she did not observe visible signs of injury or pain, symptoms suggesting the need for immediate emergency medical referral, or restricted mobility due to deformity or injury. (Doc. 74-8 at 1).

Williams was released from KCDC later that morning at 7:19 a.m. (Doc. 74 at 5; Doc. 74-10 at 1; Doc. 88 at 13). He retrieved his car and then went to the Emergency Department at the Veterans Affairs Medical Center, where he was diagnosed with a fractured right ulna. (Doc. 74 at 5; Doc. 87-1 at 1, 3; Doc. 88 at 13). Williams's injury was treated by orthopedic specialists for three months and required multiple braces. (Doc. 74-1, Williams Dep. at 42:4-24, 45:4-10, 45:22-46:5, 46:21-47:8, Doc. 88 at 13).

On June 24, 2021, Williams filed this action. (Doc. 1). In the operative pleading, the Second Amended Complaint, he alleges claims for: (1) violation of the Fourth and Fourteenth Amendments against Kenton County and Deputies Schoultheis, Slaughter, Fleckinger, and Taylor pursuant to 42 U.S.C. § 1983; (2) assault and battery against Deputy Schoultheis; and (3) negligence against Deputies Schoultheis, Slaughter, Fleckinger, and Taylor. (Doc. 36).

Defendants filed a motion for partial judgment on the pleadings, arguing that the statute of limitations had expired on Williams's state law claims. (Doc. 38). The Court denied that motion without prejudice because the issues it raised were beyond the scope of the allegations in the Second Amended Complaint and specifically noted that Defendants may "raise the issue again at a later date." (Doc. 56 at 3-4). After discovery, Defendants moved for sanctions based on an allegedly late expert disclosure, or

6

alternatively, moved to limit the use of Williams's expert's opinions to rebuttal of the expert opinions offered by Defendants. (Doc. 68 at 1–2). The Court denied Defendants' motion without prejudice, but specifically noted that Williams was only permitted to use his expert's opinions to rebut expert opinions offered by Defendants. (Doc. 73 at 1–2).

### *Analysis*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

### A. Excessive Force

Williams's § 1983 claim against Deputy Schoultheis for use of excessive force must be analyzed under the framework of the qualified immunity doctrine. The qualified immunity analysis has "two steps that can be undertaken in any order: (1) whether the

public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events." *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020) (citing *Godawa v. Byrd*, 798 F.3d 457, 462–63 (6th Cir. 2015)).

### i.   Constitutional Violation

Under the first prong of qualified immunity analysis, the Court must identify "the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[A] pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment." *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)). "Under the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (internal citations omitted).

"The inquiry is highly fact-dependent, and must take into account the 'perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20

vision of hindsight.'" *Coley v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015) (quoting *Kingsley*, 576 U.S. at 397). The analysis should also account for the government's need to manage the facility and defer when appropriate to practices necessary "'to preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). In determining the reasonableness of the force used, courts should consider the totality of the circumstances, including factors such as the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the defendant to limit the amount of force; the severity of the problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.* (citing *Graham*, 490 U.S. at 396).

Here, although the parties agree that at some point Williams suffered a broken arm, they disagree as to whether it occurred when Deputy Schoultheis used force on him or earlier that evening, when he fell during his arrest. (*See* Doc. 74 at 19; Doc. 88 at 43). However, this is a genuine issue of material fact and a reasonable jury could find that Deputy Schoultheis's use of force resulted in Williams's injury, particularly in light of the fact that the video shows Williams falling forward onto his knees during his arrest while his hands were handcuffed behind his back, not

backward onto his arm as Defendants have argued.[5] (*See* Doc. 74 at 19; Doc. 76, Cov. BWC; Doc. 88 at 43 n.14).

Regarding the severity of the issue and the threat reasonably perceived by the officer, Defendants argue that the underwear blocked Deputy Schoultheis's vision, "making him vulnerable to further physical aggression," that Williams was unrestrained, completely nude, intoxicated, and physically defiant, and that Deputy Schoultheis was attempting to push him toward the rear of the cell away from the open door because he "didn't know whether [Williams] was coming toward [him] or not." (Doc. 74 at 8; Doc. 74-7, Schoultheis Dep. at 138:19–24). However, these arguments are belied by the video footage.

Defendants have not argued that the underwear could have injured or did injure anyone. At no point did the underwear block Deputy Schoultheis's vision, as they landed on his shoulder and had been removed from his person entirely by Deputy Slaughter before he ever made contact with Williams. (*See* Doc. 76, Williams,_Cary_disruptive (Slaughter)). Thus, Deputy Schoultheis could see that Williams was not coming toward him and that Deputy Slaughter remained directly to his right where he also blocked the cell door, even if he could not see Deputy Fleckinger behind him.

---

[5] Defendants' causation arguments are addressed separately below.

Although Williams was unrestrained, he never stepped forward or attempted to exit the cell and did not make any verbal threats[6] or use any threatening gestures, such as clenched fists. That Williams was completely nude at that point also weighs against Defendants' argument that Williams posed a threat because he had nothing left to throw outside the cell. The undisputed fact that Williams was intoxicated does not indicate that he posed a threat, particularly in light of Defendants' acknowledgement that Williams had not displayed any physical aggression up to that point. *See Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (finding that, despite verbal insults and "drunken resistance," a reasonable jury could conclude that an officer used excessive force when he threw an inmate to the floor). As such, a reasonable jury could find that Williams did not pose a threat to Deputy Schoultheis's safety at the time he applied force.

While Defendants argue that an officer cannot be liable when they had no chance to recognize that a dangerous situation had become safe or when an alternative response seems more reasonable only in hindsight, such is not the case here, as a reasonable jury could conclude that Deputy Schoultheis, whose vision was not restricted, had the ability to perceive the lack of dangerousness

---

[6] Deputy Schoultheis agrees that Williams's "fascist" and "Nazi" insults toward the deputies were not imminent physical threats and that at no point did Williams make a verbal threat against him. (*See* Doc. 74-7, Schoultheis Dep. at 103:14–19).

11

posed by the situation and therefore could have reacted differently in that moment.

Defendants correctly argue that the use of force was very brief, as Deputy Schoultheis only pushed Williams back for a total of three seconds, that Deputy Schoultheis did not use a chokehold, vascular restraint, or hypoglossal pressure technique to restrict Williams's blood or airflow or cause him to lose consciousness, and that, although Deputy Schoultheis originally intended to handcuff Williams, he opted not to after Williams fell and it was clear that he did not pose a threat. (Doc. 74 at 8-10; Doc. 74-7, Schoultheis Dep. at 84:8-20). However, it is not clear as a matter of law that Deputy Schoultheis attempted to limit the amount of force used because a reasonable jury could conclude that no force was necessary to resolve the issue or to maintain institutional order and security because Defendants could have simply shut the door to the cell where Williams remained, completely nude.

Although Defendants argue that there is no genuine dispute of material fact as to whether Williams engaged in active resistance, (Doc. 74 at 8), that argument also fails. Defendants contend that Williams "defied Slaughter's instruction to place his underwear in the property bag," (*Id.*), but such an instruction was not captured on the video. On the contrary, Deputy Slaughter directed Williams to take his underwear off, which he undisputedly complied with. As Plaintiff points out, context is crucial, and it is not clear that

12

Williams's decision to fling the underwear toward Deputy Schoultheis instead of merely passing them over constitutes resistance at all, let alone active resistance, in light of the fact that Williams complied with Deputy Slaughter's ultimate demand to hand over his clothes. Indeed, Deputy Schoultheis testified that, if someone tossed underwear *to* him, rather than *at* him, he would consider that person to be following his orders. (Doc. 74-7, Schoultheis Dep. at 137:21–138:4).

"Active resistance typically involves 'a series of consciously-resistive acts' that 'unfolds in a manner where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force.'" *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 762 (E.D. Ky. 2019) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013)). Such a "series of consciously-resistive acts" undisputedly did not take place in this case because Williams complied with the directive to remove and hand over his clothes and was not given any additional commands after throwing the underwear.

The Sixth Circuit has also held that "[a]ctive resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). It is undisputed that Williams did not struggle

13

with or threaten the deputies and there is a genuine dispute of material fact as to whether his conduct constitutes disobedience.

Indeed, the cases cited by Defendants in support of their argument that Deputy Schoultheis used objectively reasonable force all involve either conscious refusal to obey an officer's direct command or clearly threatening conduct, neither of which occurred in this case. *See id.* at 642 (finding active resistance where an individual admittedly told a deputy that he wasn't going to comply, swung his arms in the deputy's direction, and tried to prevent the deputy from handcuffing him); *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 530–31 (6th Cir. 2018) (finding that a shove did not cross the constitutional line where an inmate slammed items on a table, verbally refused to obey an officer's command, and turned toward an officer with an item in his hand that he had refused to hand over while yelling); *Scott v. Kent Cnty.*, 679 F. App'x 435, 440–41 (6th Cir. 2017) (affirming summary judgment on the basis of qualified immunity where the plaintiff engaged in unruly behavior, exited his cell with clenched fists, and stepped toward an officer); *Bruck v. Petry*, No. 5:21-152-DCR, 2022 WL 2109187, at *6 (E.D. Ky. June 10, 2022) (finding that a use of force was objectively reasonable where the plaintiff posed a threat to his own safety and the safety of others, was verbally defiant, was moving unsecured about a scene involving multiple bystanders, homes, and vehicles, and began to walk away which could have been

14

perceived as an attempt to flee); *Foote v. Degenhardt*, No. 2:18-141-WOB, 2018 WL 6769325, at *1, *4 (E.D. Ky. Dec. 21, 2018) (finding active resistance where an officer's incident report reflected that he only took an inmate to the ground after he refused a direct order to face away from him and place his hands above his head so he could be handcuffed and the inmate continued to move his arms and legs while on the ground).

Although an officer need not "use the best technique in every circumstance," they must not violate an inmate's constitutional rights by using objectively unreasonable force. *See Fultz v. Whittaker*, 261 F. Supp. 2d 767, 775-77 (W.D. Ky. 2003). Because the evidence viewed in a light most favorable to Williams shows that Deputy Schoultheis's use of force broke his arm, he did not threaten the deputies' safety, and he was not actively resisting, a reasonable jury could find that Deputy Schoultheis violated Williams's constitutional right to be free from excessive force.

### ii.  Clearly Established

Under the second prong of the qualified immunity doctrine, a right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). One method of showing that an officer violated clearly established law is to "identify a case that put [the officer] on notice that his specific conduct was

unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). Accordingly, the plaintiff must identify a "case that addresses facts like the ones at issue here." *Id.*

Williams has satisfied this burden by identifying several cases in which courts have held that individuals who are not resisting and who pose no threat to others have a clearly established right to be free from a disproportionate use of force. *See Crawford v. Geiger*, 656 F. App'x 190, 204 (6th Cir. 2016) (denying qualified immunity where an officer shoved the plaintiff's chest and caused her to fall backward because "her right to be free from force while compliant, non-resistant, and non-violent was clearly established prior to [2012]"); *Jennings v. Fuller*, 659 F. App'x 867, 870 (6th Cir. 2016) (finding that a forceful takedown was not reasonable where there was no "real form of resistance or danger" when an inmate briefly and non-threateningly lowered their hand contrary to an instruction); *Lawler*, 268 F. App'x at 387 (finding that a deputy's use of force was excessive where it was disproportionate to any threat he faced from an inmate); *Fultz*, 261 F. Supp. 2d at 775-76 (finding that "the application of some compression or force to the neck" was not justified where the plaintiff presented "no active level of threat"); see also *Eldridge*, 533 F. App'x at 535 (holding that there is a clearly established right to be free from the use of physical force when a suspect is not resisting police efforts to

apprehend him) (collecting cases); *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right.") (internal citation and quotation marks omitted).

Because a reasonable jury could conclude that Williams did not pose a threat and was not resisting the deputies' orders, such a conclusion would also dictate that when Deputy Schoultheis used force against Williams, he violated Williams's clearly established constitutional right.

### B. Failure to Intervene

An officer's "mere presence" during an altercation cannot suffice to subject them to liability. *Burgess*, 735 F.3d at 475 (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). However, an "officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (internal citation omitted).

Assuming that Williams has presented evidence from which a reasonable jury could conclude that Deputies Slaughter and Fleckinger had reason to know that Deputy Schoultheis's use of

force was excessive,[7] he has failed to show that either had the opportunity and means to stop Deputy Schoultheis's actions. Undisputedly, the use of force lasted for only three seconds and Williams has failed to demonstrate that such a short period of time was long enough for anyone to perceive what was going on and react to stop it. *See Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018) ("[T]he Sixth Circuit has repeatedly held that officers are not liable under failure-to-intervene claims when the ostensible opportunity and means to intervene does not last long enough for the officer to both perceive what was going on and intercede to stop it.") (internal citations and quotation marks omitted).

In *Burgess*, the Sixth Circuit found that a takedown that lasted no more than ten seconds was not long enough for two other officers to perceive the incident and intervene. 735 F.3d at 476. Similarly, in *Kowolonek v. Moore*, a "rapid sequence of events" lasting only "minutes" did not provide officers with the opportunity to intervene and prevent any harm from occurring. 463 F. App'x 531, 539 (6th Cir. 2012). An incident lasting only "six to seven seconds" was also not long enough to impose a duty to intervene on officers. *Ontha v. Rutherford Cnty.*, 222 F. App'x

---

[7] Deputy Taylor was not present for that incident and Williams does not argue that he should be liable for failing to intervene regarding Deputy Schoultheis's actions. (*See* Doc. 88 at 27).

498, 506 (6th Cir. 2007); *see also Fultz*, 261 F. Supp. 2d at 780 (dismissing a failure to intervene claim where it was undisputed that "the events happened in a matter of seconds").

The lone case cited by Williams, *Kent v. Oakland County*, is distinguishable, as the officers in that case had been communicating as the events unfolded and, critically, the officer who tased the suspect gave a verbal warning that he would do so. *See* 810 F.3d 384, 397 (6th Cir. 2016). Here, Deputy Schoultheis gave no indication, verbal or otherwise, that he was going to use force before he did so. Thus, Deputies Slaughter and Fleckinger had no opportunity, other than the three-second-long period while Deputy Schoultheis was pushing Williams, to process what was happening and step in. This is insufficient as a matter of law.

Williams's arguments that the deputies were standing in close proximity, that Deputy Slaughter reached out and grabbed the underwear from Deputy Schoultheis's shoulder, and that Deputy Slaughter was able to say "Alright" during the incident, (Doc. 88 at 28), similarly fail because none of these facts indicate that either Deputy Slaughter or Deputy Fleckinger had any reason to anticipate what Deputy Schoultheis was going to do or that it would result in Williams falling on the floor. *See Burgess*, 735 F.3d at 476 (affirming dismissal of a failure to intervene claim where the defendants "had no reason to anticipate the takedown or its result"). Indeed, by the time Deputy Slaughter reached Williams

19

and Deputy Schoultheis inside the cell at 11:43:47 p.m., three seconds after the initial contact was made, Deputy Schoultheis had removed his hand from Williams's neck. (Doc. 76, Williams,_Cary_disruptive (Slaughter)). Deputy Fleckinger, who was standing at least a few feet behind the other deputies, necessarily could not have caught up to Deputy Schoultheis any faster than Deputy Slaughter did. (*See id.* Williams C 16_T1).

Because there is no evidence from which a reasonable jury could conclude that Deputies Slaughter and Fleckinger had time to perceive Deputy Schoultheis's use of force and intercede to stop it, Williams's failure to intervene claim fails as a matter of law.

### C. Deliberate Indifference to a Serious Medical Need

A pretrial detainee, like Williams, must satisfy two elements for a claim based on deliberate indifference to a medical need under the Fourteenth Amendment: (1) he had a sufficiently serious medical need and (2) each defendant acted deliberately, not accidentally, and recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *See Helphenstine v. Lewis Cnty.*, --- F.4th ---, No. 22-5407, 2023 WL 1859890, at *5-6 (6th Cir. Feb. 9, 2023) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021)).[8]

---

[8] Although the Sixth Circuit issued its opinion in *Helphenstine* after this matter was fully briefed, the parties sufficiently addressed the

Williams's broken arm, which Defendants do not dispute he had during his incarceration at KCDC, satisfies the first element, as it was a sufficiently serious medical need. *See Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996) (finding that a broken arm was "clearly a 'serious medical need'").

      i.   *Deputies Schoultheis, Slaughter, and Fleckinger*[9]

Williams has failed to establish the second element as to Deputies Schoultheis, Slaughter, Fleckinger because he has not introduced evidence that they knew or should have known that Williams had a serious medical need or that any medical needs he did have subjected him to an unjustifiably high risk of harm. At no point during the video footage of the use of force incident can Williams be heard to complain of pain, even by merely saying "ouch," or be seen to exhibit any visible symptoms of a broken arm, such as swelling or a deformity. (*See* Doc. 76, Williams,_Cary_disruptive (Slaughter)). Indeed, Williams testified that he did not experience pain or see swelling in his arm until he was woken up for his "diabetic check" several hours after the incident. (Doc. 87-3, Williams. Aff. ¶¶ 21-22). Williams does not allege that he had any contact with Deputies Schoultheis,

---

underlying facts such that the Court can apply the *Brawner* test without further input.

[9] Williams contends that Defendants have not argued that the deliberate indifference claims against Deputies Schoultheis and Slaughter should be dismissed, (Doc. 88 at 29), but that ignores Defendants' claim that Williams has not met "his burden to show that *any* deputies' conduct was deliberately indifferent . . . ." (*See* Doc. 74 at 17) (emphasis added).

Slaughter, or Fleckinger after he became aware of his arm injury and, thus, he necessarily could not have reported such symptoms to any of them.

Although an officer may be held liable despite a lack of *subjective* awareness of risks to the detainee, the situation must be such that a *reasonable* officer in their position would know of the risks. *See Brawner*, 14 F.4th at 596–97 (collecting cases). An officer does not act with deliberate indifference, where, as here, they had no reason to appreciate the seriousness of the plaintiff's condition. *See Helphenstine*, 2023 WL 1859890, at *10 (citing *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006)). That each deputy was aware that force had been used against Williams does not mean that they should have automatically also been aware that he was subjected to an unjustifiably high risk of harm, particularly in light of the fact that Williams himself did not even realize he had been injured until several hours later.

Williams has not cited case law for his proposition that a deputy's failure to ask an inmate whether they are injured or contact medical services after a use of force equates to deliberately ignoring a serious medical need even where no signs of an injury are present and the inmate has not complained of an injury. (*See* Doc. 88 at 30–31, 33–34). Although Deputy Fleckinger testified that typically, inmates at KCDC would "at least be given the opportunity to be seen by medical staff" after a use of force,

(Doc. 74-14, Fleckinger Dep. at 71:4-72:2), failure to follow an internal custom does not give rise to a deliberate indifference claim. *See Helphenstine*, 2023 WL 1859890, at *10 (citing *Griffith v. Franklin Cnty.*, 975 F.3d 554, 578 (6th Cir. 2020)). Neither can Williams's claim be supported by the fact that Deputies Slaughter and Fleckinger failed to create reports regarding the use of force, in light of the fact that Deputy Schoultheis did. (*See* Doc. 88 at 30-31, 33-34).

Accordingly, Williams's deliberate indifference claim against Deputies Schoultheis, Slaughter, and Fleckinger fails.

### ii.  Deputy Taylor

Unlike the other deputies, Deputy Taylor was present when Williams complained of arm pain during his assessment with Nurse Miller.[10] (Doc. 74 at 5; Doc. 87-3, Williams Aff. ¶¶ 22-23). However, the Sixth Circuit has "recognized that a 'non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" *Greene v. Crawford Cnty.*, 22 F.4th 593,

---

[10] Although Deputy Taylor testified that he does not recall Williams saying his arm was injured, (*see* Doc. 74-9, Taylor Dep. at 146:12-147:10), Defendants admit in their Motion that Williams "complained of arm pain" during his visit with Nurse Miller. (Doc. 74 at 5). Nonetheless, the Court must draw all factual inferences in favor of Williams while analyzing Defendants' Motion for Summary Judgment and must resolve the factual dispute in favor of Williams's testimony that he told Deputy Taylor and Nurse Miller, "I think you guys broke my arm." (*See* Doc. 87-3, Williams Aff. ¶ 23).

608 (6th Cir. 2022) (quoting *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017)).

Here, Deputy Taylor, who was not medically trained, reasonably deferred to the opinion of Nurse Miller, a medical professional, when she determined that, despite Williams's complaints, his mobility was not restricted and his symptoms did not "suggest[] the need for immediate emergency medical referral." (*See* Doc. 74-8 at 1).[11] Although Deputy Taylor testified that he did not remember Williams stating that he was hurt or that he needed medical attention and that there was nothing about Williams's arm that stood out to him as requiring medical treatment, he testified that, if Williams had raised an issue, he would have relied on Nurse Miller to "check[] him out" and "address[] it then." (Doc. 74-9, Taylor Dep. at 136:24-137:4, 137:17-22).

Where an inmate's medical condition and need for treatment is not obvious to trained medical personnel, it would not be obvious

---

[11] Williams cites *Greene*, 22 F.4th at 608, for the proposition that a deputy must ask for and follow the advice of a medical professional in order to avoid liability for deliberate indifference and argues that because Deputy Taylor has not alleged that he sought Nurse Miller's advice, he cannot rely on her judgment. (Doc. 88 at 32). However, this argument misinterprets *Greene*, as the issue in that case was whether the person who issued a judgment was a medical professional, not whether the deputies could rely on medical opinions that were given without formal solicitation by a jail official. *See* 22 F.4th at 608. It is undisputed that Nurse Miller is a medical professional and that she and Deputy Taylor were informed of Williams's pain simultaneously. Thus, the fact that he did not ask for her opinion before she gave it is not dispositive.

to a lay officer either. *See Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009). Because Williams's need for treatment was not obvious to Nurse Miller, Williams has failed to establish that it should have been obvious to Deputy Taylor. Neither has Williams introduced evidence from which a reasonable jury could conclude that Williams's circumstances changed in the hours following Nurse Miller's visit such that his medical need should have become obvious to Deputy Taylor later. Thus, Williams has failed to show that Deputy Taylor was or should have been aware of an unjustifiably high risk of harm arising out of his failure to secure medical treatment for Williams and that he deliberately acted in spite of such risk.

The Court finds that Deputy Taylor is also entitled to judgment as a matter of law on Williams's deliberate indifference claim.

### D. County Liability

Williams has claimed that Kenton County is liable for alleged violations of his constitutional rights in addition to bringing claims against Deputies Schoultheis, Slaughter, Fleckinger, and Taylor in their official capacities. Because "[s]uing a government employee in his official capacity 'generally represent[s] only another way of pleading an action against an entity of which the officer is an agent,'" the Court will dismiss the official capacity claims against each deputy, as those claims are duplicative of the

claims against Kenton County. *See Barr v. Jefferson Cnty. Bd. of Educ.*, 686 F. Supp. 2d 699, 704 (W.D. Ky. 2010) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)) (finding that in the Eastern and Western Districts of Kentucky courts have "adopted the practical approach" of dismissing official capacity claims where the local government entity is also a named defendant).

Congress only intended for counties to be liable when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). To show such a policy, the plaintiff "must point to a municipal 'policy or custom' and show that it was the 'moving force' behind the constitutional violation." *Crabbs v. Scott*, 800 F. App'x 332, 336 (6th Cir. 2020) (quoting *id.* at 694). Thus, a plaintiff must do three things to succeed on a *Monell* claim: (1) identify a policy; (2) connect the policy to the municipality; (2) and show that his injury was caused by the execution of that policy. *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

However, where "there is no constitutional violation, there can be no municipal liability." *Cleary v. Cnty. of Macomb*, 409 F. App'x 890, 906 (6th Cir. 2011). Accordingly, because the only constitutional violation that Williams has sufficiently alleged is

Deputy Schoultheis's excessive use of force, the Court need only assess Kenton County's liability with respect to that claim.[12]

There are four methods of satisfying the first prong of *Monell* and identifying a municipality's policy or custom: "the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Jackson*, 925 F.3d at 828 (quoting *Burgess*, 735 F.3d at 478).

In order to comply with the first method and illustrate that a municipality has an illegal policy, "the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Id.* at 829 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). Where policies are not written, they must be "'so permanent and well

---

[12] Although Williams cites *Garner*, 8 F.3d at 365, for its holding that a municipality may still be liable for a § 1983 violation even if the officer who committed the violation is entitled to qualified immunity, (Doc. 88 at 35), that argument is inapplicable here, as Williams's failure to intervene and deliberate indifference claims do not fail on qualified immunity grounds, but rather because Williams has not shown that any Defendant committed those constitutional violations. Thus, Kenton County cannot be liable for failure to intervene or deliberate indifference to Williams's medical needs either.

settled as to constitute a custom or usage with the force of law.'" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Monell*, 436 U.S. at 691).

Williams argues that Kenton County has an unwritten official policy permitting deputies to use gratuitous and excessive force in the form of "reflex reactions" or "instant reactions" which can be performed without assessing the threat posed by an individual at the time the force is used. (Doc. 88 at 36). As evidence of this policy, Williams points to the testimony of Captain Trey Smith ("Captain Smith"), Kenton County's Rule 30(b)(6) representative, Lieutenant Michael Carman ("Lieutenant Carman"), the KCDC Use of Force training instructor, and Sergeant Alexander Kelly ("Sergeant Kelly"), Deputy Schoultheis's supervisor.

Captain Smith testified that "throwing soft objects that [would] not cause harm to [a] deputy," including clothing, whether soiled or unsoiled, is considered "active aggression" under KCDC policy. (Doc. 84, Smith Dep. at 115:16-23). This is the "second to highest level of resistance that a prisoner can engage in" and imposes on deputies "the duty to utilize hard, empty hand control and intermediate weapons." (*Id.* at 116:25-117:3, 157:5-15; *see also* Doc. 74-12, KCDC Policy 3.1.8 at 21-22). This duty to act is imposed regardless of whether the fighting act is ongoing and there is "no obligation by the officer prior to responding with the use of force to assess after the first strike whether the fight is

28

ongoing." (Doc. 84, Smith Dep. at 121:4-8, 121:18-22). Sergeant Kelly similarly testified that, under KCDC policy, when a prisoner throws clothing, a deputy is permitted to respond with hard empty hand control or use an intermediate weapon, such as a baton. (Doc. 85, Kelly Dep. at 27:11-18, 28:10-21). KCDC Policy 3.1.8 defines hard empty hand control as "[t]echniques that involve striking to include but not limited to punching, kicking, knee strikes, etc." (Doc. 74-12 at 19).

Lieutenant Carman testified that deputies may respond in a "reactionary" way after clothing is thrown at them, including by punching, striking, or kicking the inmate or by using an impact weapon like a baton. (Doc. 74-11, Carman Dep. at 60:18-61:8, 62:2-11). Lieutenant Carman noted that, for example, if an inmate threw a sock at a deputy, Kenton County policy permits the deputy to respond by punching, kicking, or striking the inmate with an impact weapon. (*Id.* at 62:12-63:2).

This testimony is evidence from which a reasonable jury could find that Kenton County had an unwritten official policy to permit deputies to use gratuitous or excessive force whenever an inmate throws any object, without assessing whether there is a safety threat or whether force is necessary to achieve institutional goals. The fact that three employees of Kenton County, each of whom hold a supervisory and/or training position, testified to the same unwritten understanding of the written policy is sufficient

to connect the policy to the County and to allow a reasonable jury to conclude that their interpretation is so well settled as to constitute a custom or usage with the force of law. Further, no witness has testified to a contrary interpretation of the policy.

Williams has also introduced evidence from which a reasonable jury could find that this policy was the "moving force" that caused a violation of his constitutional rights. Although Deputy Schoultheis used less force than he was permitted to under the policy, as he did not punch, kick, or strike Williams, Williams has persuasively argued that Deputy Schoultheis used excessive force against him without assessing whether he posed a threat or whether the force was necessary to resolve the issue and that, in doing so, Deputy Schoultheis complied with his "duty" to respond to Williams's thrown underwear under Kenton County policy.[13]

Accordingly, Kenton County is not entitled to summary judgment on Williams's *Monell* claim for excessive use of force.[14]

---

[13] Defendants' citation of *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), for the proposition that Williams must show evidence of a clear and persistent pattern of unconstitutional activity or tacit approval of it, (Doc. 90 at 7), is misplaced, as those elements pertain to evidence submitted in support of the fourth method of identifying a policy, demonstrating the existence of a custom of tolerating federal rights violations, and Williams has not attempted to use that method to meet his burden.

[14] Because the Court finds that Williams has introduced evidence sufficient to satisfy the first method of identifying a policy or custom, it need not address the parties' arguments regarding the second method, ratification, or the third method, inadequate training or supervision.

### E. Causation

Under Kentucky law,[15] "a plaintiff ordinarily must present expert medical testimony to establish the causal link between an accident and his injuries." *Roark v. Speedway, LLC*, No. 13-139-ART, 2015 WL 12978822, at *1 (E.D. Ky. Apr. 6, 2015) (citing *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965)). However, there is an exception to this rule and the issue of causation may "go to the jury without expert testimony only in cases where causation 'is so apparent that laymen with general knowledge will have no difficulty in recognizing it.'" *Id.* (quoting *Jarboe*, 397 S.W.2d at 778).[16]

Defendants argue that Williams cannot demonstrate causation as to his fractured ulna under this standard because he has not offered expert testimony on that point. (Doc. 74 at 18-20). However, this argument fails because Williams's broken arm qualifies under the exception to Kentucky's rule requiring expert

---

[15] Defendants argue that Kentucky's medical causation requirement applies to the federal and state law claims in this case, (Doc. 74 at 18), and that proposition is not contested by Williams. Accordingly, the Court assumes it applies to Williams's § 1983 claim in addition to his state law claims. *See Estep v. Combs*, 467 F. Supp. 3d 476, 496 n.20 (E.D. Ky. 2020) (applying Kentucky's medical causation requirement to a § 1983 claim).

[16] Defendants argue that "fact witness testimony will not be able to demonstrate to a lay jury that causation is probable and not merely possible," (Doc. 74 at 19), but that standard only applies to expert medical testimony, not fact testimony under the exception when causation is apparent to laypeople. *See Jarboe*, 397 S.W.2d at 778 ("There may, of course, be situations in which causation is so apparent that laymen with a general knowledge would have no difficulty in recognizing it. But excepting those situations we have adhered to the rule that the causal connection between an accident and an injury must be shown by medical testimony and the testimony must be that the causation is probable and not merely possible.") (internal citations omitted).

medical testimony, as laypeople with general knowledge can view the evidence and will have no difficulty in understanding the mechanism of Williams's injury. Thus, Williams need not introduce expert testimony to survive summary judgment on the issue of causation.

In *Tatham v. Palmer*, the Kentucky Supreme Court concluded that the causation question could go to the jury where the plaintiff hit his head on the windshield during a car accident and then suffered headaches and nervousness, neither of which were present before the accident, because "it is within the realm of common knowledge that a severe blow to the head will cause headaches." 439 S.W.2d 938, 938-40 (Ky. 1969). Further, in *Roark*, a court in this District held that a plaintiff did not have to present expert medical testimony to establish causation between an electrical shock and a burn because, that too was "within the realm of common knowledge." 2015 WL 12978822, at *2 (citing *id.* at 939). However, that court also held that there was no obvious connection between a fall and a seizure a few months later or between a fall and back, shoulder, and wrist injuries where the plaintiff had similar previous accidents. *Id.* In *Estep*, another court in this District held that a plaintiff's claim that he sustained bruising and a wound on his wrist from handcuffs did not require expert testimony and the defendant's "speculation regarding other potential sources for the damage" did not mean that he was entitled

to summary judgment on causation under Kentucky law. 467 F. Supp. 3d at 495-96.

Just as with the headaches in *Tatham* and the burn in *Roark*, the causal relationship between a fall and a broken arm is "within the realm of common knowledge." A broken arm, unlike the seizure in *Roark*, is not a complicated medical diagnosis and is certainly one for which lay jurors are capable of determining causation.

Further, Defendants' argument that Williams fell backwards while handcuffed less than two hours before Deputy Schoultheis's use of force, (Doc. 74 at 19), is plainly contradicted by the bodycam footage of that fall, which depicts him falling forward onto his knees and does not show his right arm making contact with the ground or any other object. (*See* Doc. 76, Cov. BWC). Contrary to Defendants' position, the mechanisms of possible injury are not identical because Williams did not fall "backwards with an outstretched arm against a hard surface" during his arrest, which would certainly have been difficult, if not impossible, to do while his hands were handcuffed behind his back. (*See* Doc. 74 at 19). Thus, that fall was not "just as likely to have caused the fracture." (*See id.*).

Similarly, Defendants have not pointed to any evidence to support their claim that Williams was "involved in a physical altercation outside Rosie's Tavern," (Doc. 90 at 9), and Williams's testimony reflects that the exchange that precipitated the 911

33

call "was all verbal" and there was no physical altercation prior to his arrest, (Doc. 74-1, Williams Dep. at 61:10–21).

Defendants' mere speculation as to other potential causes for Williams's injury does not entitle them to summary judgment on causation, particularly when that speculation is not supported by any evidence in the record. *See Estep*, 467 F. Supp. 3d at 496. Unlike in *Roark*, where there was undisputed evidence of prior injury to the plaintiff's back, shoulders, and wrists, Defendants have failed to identify evidence of a "history of accidents" that could explain Williams's fractured arm. *See* 2015 WL 12978822, at *2. Indeed, just as with the burn in that case, Defendants here have introduced no other viable explanation for Williams's injury. *See id.* Just as in *Tatham*, here, Williams testified that his arm was not injured before Deputy Schoultheis's use of force. (Doc. 87-3, Williams Dep. at ¶¶ 3, 18). That Williams did not make an expression of pain or claim injury immediately after he fell at KCDC does not establish that the fall did not cause his injury, particularly in light of the fact that Defendants do not argue that Williams broke his arm at any point after that fall.

Reasonable jurors could use their common knowledge to conclude that Deputy Schoultheis's use of force caused Williams's broken arm, even without expert testimony. Accordingly,

Defendants' Motion for Summary Judgment with respect to causation will be denied.[17]

## F. State Law Claims

Defendants also argue that Williams's state law claims, for assault and battery against Deputy Schoultheis and for negligence against all four deputies, fail because they are entitled to qualified official immunity under Kentucky law and because both claims are time-barred. (Doc. 74 at 20-24). Each argument is addressed below.

### i.   Qualified Official Immunity

Under Kentucky law, "[w]hen a public officer or employee is sued in his or her individual capacity, that officer or employee may enjoy qualified official immunity 'which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.'" *Ritchie v. Turner*, 559 S.W.3d 822, 831 (Ky. 2018) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero*, 65 S.W.3d at 522.

---

[17] Because the Court finds that Plaintiff's injury falls under the exception to the rule requiring expert medical testimony, it declines to address the parties' arguments regarding the potential exclusion of any testimony from the physicians who treated Plaintiff's injury in the context of Defendants' Motion for Summary Judgment.

Deputy Schoultheis is not entitled to qualified official immunity for Williams's assault and battery claim against him. Even assuming that Deputy Schoultheis was engaging in a discretionary act within the scope of his authority when he decided how much force he should use against Williams, *see Scherzinger v. Bolton*, No. 3:11-CV-11-H, 2013 WL 3166163, at *9 (W.D. Ky. June 20, 2013) (finding that "the decision to administer force in an effort to maintain order and control in [a correctional] facility is a discretionary act"), Williams has introduced evidence from which a reasonable jury could conclude that Deputy Schoultheis was acting in bad faith.

Bad faith "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523. Because the Court concludes, as discussed above, that a reasonable jury could find that Deputy Schoultheis violated Williams's clearly established Fourteenth Amendment right to be free from excessive force, such a finding would equate to a finding of bad faith for state law immunity purposes. *See Browning v. Edmonson Cnty., Ky.*, 18 F.4th 516, 530-31 (6th Cir. 2021) (finding that where a

36

defendant used excessive and objectively unreasonable force in violation of the plaintiff's clearly established constitutional rights, the defendant did not act in good faith and was thus not entitled to qualified official immunity under Kentucky law); *Mills v. Owsley County Ky.*, 483 F. Supp. 3d 435, 476–77 (E.D Ky. 2020) (finding that allegations that a defendant used excessive and unreasonable force equated to allegations of bad faith under Kentucky qualified official immunity law).

However, Williams's negligence claim against all four deputies fares differently. Although it is difficult to determine from the vague allegations in the Second Amended Complaint which of Defendants' actions Williams is asserting constituted violations of their duty of reasonable care, (*see* Doc. 36 ¶¶ 48–49), Williams only raises arguments regarding their failure to notify medical staff of Williams's need for medical attention in his Response to Defendants' Motion for Summary Judgment. (Doc. 88 at 45–46).[18] Williams does not dispute that the third element of qualified official immunity is satisfied because decisions regarding whether to secure medical care for inmates are within the scope of each deputy's authority.

---

[18] Williams's negligence claim under Kentucky law cannot be based on the same conduct that forms the basis of his excessive force and battery claims. *See Hart ex rel. Dillon v. Lawson*, No. 6:20-147-JMH, 2021 WL 3713052, at *3 (E.D. Ky. Aug. 19, 2021) (collecting cases).

"Discretionary acts or functions are 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . .'" *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006) (quoting *Yanero*, 65 S.W.3d at 522). On the other hand, ministerial acts "are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (quoting *Yanero*, 65 S.W.3d at 522).

The decision of Deputies Schoultheis, Slaughter, and Fleckinger not to contact medical staff after Deputy Schoultheis's use of force required their judgment as to whether Williams needed medical care and, thus, was discretionary. *See Noble v. Three Forks Reg'l Jail Auth.*, 995 F. Supp. 2d 736, 744 (E.D. Ky. 2014) (finding that the decision to provide medicine to an inmate was discretionary). Further, there is no evidence that any statute, policy, or order required the deputies to contact medical staff, where, as here, there were no signs of an injury and Williams did not complain of an injury. *See Pelfrey v. Hughes*, No. 2021-CA-0741-MR, 2022 WL 15526542, at *2 (Ky. Ct. App. Oct. 28, 2022) (finding that jail employees' decision not to contact medical staff was discretionary where the plaintiff had not alleged that there was a jail policy or law mandating they do so).

38

Further, Deputy Taylor's decision not to override Nurse Miller's assessment that Williams did not require emergency medical treatment was also discretionary. *See Walker v. S. Health Partners*, 576 F. Supp. 3d 516, 550 (E.D. Ky. 2021) (citing *Medley v. Shelby Cnty.*, 742 F. App'x 958, 961 (6th Cir. 2018)) (holding that deputies' decision not to "second-guess[]" the decisions of medical staff and call an ambulance was discretionary). As discussed above, contrary to Williams's argument, it is immaterial that Deputy Taylor did not solicit Nurse Miller's medical opinion before she offered it, particularly given that he was informed of William's arm pain at the same time she was.

Because Defendants have established that they acted within the scope of their discretionary authority with respect to seeking medical treatment for Williams, Williams must establish that their actions were not performed in good faith. *See Yanero*, 65 S.W.3d at 523 (internal citations omitted). He has failed to meet this burden. As discussed above, Williams has not shown that Defendants violated any constitutional right by failing to contact medical staff and he has not alleged that Defendants violated any of his statutory rights. Neither has Williams introduced evidence from which a reasonable jury could conclude that any deputy willfully or maliciously intended to harm him or acted with a corrupt motive.

Accordingly, each Defendant is entitled to qualified official immunity from Williams's negligence claim.

### ii.   Statute of Limitations

"Kentucky courts have consistently held that whatever statute of limitations applies, it is not tolled until summons is issued." *Wm. H. McGee & Co. v. Liebherr Am., Inc.*, 789 F. Supp. 861, 866 n.1 (E.D. Ky. 1992) (citing *Brock v. Turner Fuel Co.*, 178 S.W.2d 427, 429 (Ky. 1944); *Simpson v. Antrobus*, 86 S.W.2d 544, 545-46 (Ky. 1935); *Whittinghill v. Smith*, 562 S.W.2d 649, 650 (Ky. Ct. App. 1977)). However, the statute of limitations is an affirmative defense that may be waived. *Postal Enterprizes, LLC v. Salas Enters. Corp.*, No. 2009-CA-000488-MR, 2009 WL 4723242, at *3 (Ky. Ct. App. Dec. 11, 2009) (citing *Thompson v. Ward*, 409 S.W.2d 807, 808-09 (Ky. 1966); *Commonwealth Dep't of Highways v. Chinn*, 350 S.W.2d 622, 623 (Ky. 1961)).

In support of their Motion for Summary Judgment, Defendants renew the argument that they originally made in their Motion for Partial Judgment on the Pleadings: because it is undisputed that no summonses have issued to any of them in this case, the statute of limitations was never tolled on either of Williams's state law claims and each has thus expired during the pendency of this litigation. (Doc. 38 at 1-3; Doc. 74 at 20-21). Because the Court concludes that Defendants are entitled to qualified official immunity from Williams's negligence claim, the Court need only decide whether his assault and battery claim against Deputy Schoultheis is barred by the statute of limitations.

Deputy Schoultheis cannot succeed on his statute of limitations argument because he executed a "WAIVER OF THE SERVICE OF SUMMONS" in which he "waive[d] any objections to the absence of a summons or of service." (Doc. 8 at 2). He cannot now claim that he only waived *service* of summons, not the issuance of summons, in light of the waiver's clear language barring future objections to "the *absence* of a summons." (*See id.*) (emphasis added).

Indeed, each case cited by Defendants in support of their argument is factually inapposite. *See Eades v. Clark Distrib. Co.*, 70 F.3d 441, 443-44 (6th Cir. 1995) (finding that Federal Rules of Civil Procedure 3 and 4 do not conflict with state law on the tolling of statutes of limitation, but not opining on whether a party could voluntarily waive a state statute of limitations defense); *Corporex Companies, LLC v. Proskauer Rose, LLP*, 713 F. Supp. 2d 678, 688 (E.D. Ky. 2010) (holding that mailing a request to waive service did not commence an action under Kentucky law but declining to address whether return of the executed waiver would suffice to commence the action); *Liebherr*, 789 F. Supp. at 862 (finding that the summons was issued after the statute of limitations had expired).

Accordingly, Deputy Schoultheis has waived any defense that the statute of limitations for the assault and battery claim was

41

not tolled because a summons did not issue. Thus, the Court finds that Williams's claim is timely.[19]

### G. Plaintiff's Motion to Exclude or Limit the Testimony of Defendants' Expert

Finally, Williams has moved to exclude or limit the testimony of Defendants' expert, Michael Bosse ("Bosse"), because Bosse has failed to indicate that he used reliable principles and methods to draw his conclusions, he offers inadmissible legal conclusions, and his testimony is likely to be unhelpful to the jury. (Doc. 79 at 1). In response, Defendants assert that Williams's Motion is moot because they did not rely on any of Bosse's opinions in support of their Motion for Summary Judgment and, if the matter proceeds to trial, "Bosse will not be an expert witness for any Defendant." (Doc. 82 at 1). Based on this representation, the Court will deny Williams's Motion to Exclude or Limit Bosse's Testimony as moot. However, Defendants may not later choose to void this commitment and are thus precluded from introducing Bosse's opinions during future proceedings in this matter.

### *Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

---

[19] The Court need not address the parties' equitable estoppel arguments in light of Deputy Schoultheis's clear waiver of arguments based on the absence of a summons.

(1) Defendants' Motion for Summary Judgment (Doc. 74) be, and is hereby, **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion;

(2) Plaintiff's Motion to Exclude or Limit the Testimony of Defendants' Expert (Doc. 79) be, and is hereby, **DENIED AS MOOT**, but Defendants are precluded from offering Bosse's opinions in future proceedings in this matter;

(3) Plaintiff's Motion to Strike Arguments Raised in Defendants' Reply (Doc. 92) be, and is hereby, **DENIED**;

(4) Plaintiff's Alternative Motion for Leave to File a Sur-Reply *Instanter* (Doc. 92) be, and is hereby, **GRANTED** and Plaintiff's Sur-Reply (Doc. 92-1) is deemed filed concurrently herewith; and

(5) Defendants Leonard Slaughter, Cory Fleckinger, and Nick Taylor be, and are hereby, **DISMISSED** from this matter.


This 16th day of February 2023.



**Signed By:**

**_William O. Bertelsman_**  ᗯOB

**United States District Judge**